Your Honor, I am Steve Sims from Baltimore, representing Trans-Tec, and so we go from the dark alleys of Pasadena to the bright port of Long Beach, where there are containers moving from all sorts of parts of the world, and large container ships pulling in and out from places like Korea and Hong Kong, and circulating throughout the world. Happily this one is gone, right? This ship was arrested in 2003, security was put up, and it sailed somewhat happily, and that's exactly the picture that the court should have as it looks at this situation, because this isn't an isolated transaction. What we're looking at is a transaction of a steamship line that had I think eight to ten ships, of which the Harmony Container was one. The Harmony Container went in a continuous loop from Long Beach or Manzanillo, which is just below San Diego, lots of U.S. cargo comes in from there too, over to Hong Kong, up to Korea, and back again. Just like you refuel your car, depending on when you're driving in Long Beach or Pasadena or San Diego or wherever you are, these ships refuel all over the world, and they refuel with suppliers like Transtek, and Transtek, the record shows, had an ongoing relationship with Ken Hung, this charterer, and in that relationship, it was based on contract, and the contract had a choice of law clause, and the choice of law clause was a choice of United States law. Why? Because there are many jurisdictions that were involved, including the United States. Some disputed that this load of fuel that we're talking about here got the ship from the Pacific to Manzanillo to deliver cargo to the United States. This case is about the essential nature of choice of law clauses in international contracts, and particularly this kind of contract, and also the freedom of contract, and related to that, the freedom of these parties, whether United States law or Malaysia law applies to choose the law that they want to apply to the transaction. If, well, there's two ways to get to the United States law. One is that Malaysian law applies, and then you determine whether or not under Malaysian law you would give credence to the U.S. choice of law provision, and so the answer could be yes or no. If the answer is yes, you end up with U.S. law, and you end up, that's where you want to be, correct? Yes. Okay, so let's just assume, or you get there directly. Yes. So, let's just assume you get to U.S. law. It seems to me the more, and whether we get to U.S. law or not is, I mean, those are sort of traditional questions we deal with all the time, and so those are not complicated, but if it's U.S. law, does it apply to provision of these necessities or necessaries outside of the territorial jurisdiction of the United States? Yes, and this is when we're going to talk about the Trinidad case of the Fifth Circuit. The court's golf trading decision. The 11th or the 5th? It's the 5th. Okay. It is, back then it was the 5th. The court's golf trading decision, what did it say? It said, if there's a U.S. supplier providing the necessaries in a foreign port, there's a maritime lien. What did the Fifth Circuit's Queen of Le Mans case say? It said, if there's a foreign supplier supplying a necessary in a U.S. port, although that was about marine insurance and the foreign supplier was a London insurer collecting for insurance which insured the ship all over the world, then that's okay. Okay, so what do we have the court saying already? U.S. supplier, foreign supply, maritime lien. In which case is this? This is the Queen of Le Mans case, and in the golf trading case, U.S. supplier, foreign supply, maritime lien, Queen of Le Mans. Foreign supplier in the U.S., maritime lien. Looking back at the legislative history, which is what the Camilla Court did not do, and just to step aside for a second, the unfortunate thing of the development of maritime commerce where things move in containers and there are fewer actors involved in the system is that the courts are less and less experienced in maritime law. You see things like this Camilla doctrine saying that there's no maritime lien for foreign over and over again as gospel when it's not supported at all. And what the court needs to do is to go back into the history of United States maritime lien law and what the court did in Camilla was really turn it on its head. United States maritime lien law has always been, if we want to use the word, extraterritorial. The only change that there's ever been statutorily in maritime lien law to the way maritime liens apply was around the turn of the century overturning what was called the home port doctrine. And the home port doctrine was that you did not have a maritime lien for a provision that you gave to a ship in its own home port. So if you were a supplier in New Orleans and the ship was based in New Orleans and you gave stuff to the ship in New Orleans, you didn't have a maritime lien. Now that's about as domestic as it gets. But the cases we cite in the brief, the Scotland, the Lackawanna, the discussion in Benedicts, the treatise, all talk about saying yes, if there's a foreign supply, a foreign provider, the ship shows up in the U.S., it's arrested, you bet there's a maritime lien. So when you dig behind the Camilla case and you look at the legislative history, what it's doing is seizing on the 1971 amendments. The only change there was that there didn't have to be inquiry by the supplier about whether there was a no lien clause in the contract. And this court in the Gulf trading case said, according to the legislative history and we to take care of the question of whether a maritime lien arises against the ship. But that's all governed by statute now, right? It is statute codifying the maritime law, yes. So what, let's take the way this law is written, it says if you provide necessaries, you get a lien. That's basically what it says. Yes. So the question then is, if all of the conduct related to that takes place outside the territorial jurisdiction in the United States, do you still get a lien? Yes. Okay. So if you look at most U.S. statutes, they kind of read like this, let's take the copyright statute, more or less it tells you what your copyright, what's protected under the copyright and then it tells you you can sue somebody if they violate that. But of course we say you can't do it for copyright violations that occur outside the territory of the United States. Now the statute reads a lot like this statute, it doesn't say anything about in or outside the United States, it just talks about you get a certain right. But then the U.S. Supreme Court has said, yeah, but it doesn't extend beyond the boundaries. Why is this statute different? Well take a copyright violation. If I have a, someone in France that's infringing my copyright, copyright law, the way it's been construed says I can't go to France and sue somebody on U.S. law based on that copyright violation. Maritime law is different, just like... Well it says you can't, whether you can go to France or not, it's up to French law. What the U.S. law says is you can't sue in the United States for the violation that occurred in France. Correct. And the Gulf trading case, the remand in the U.S., in the Exxon case, says maritime law is different. You make a provision in a foreign port where U.S. law applies, you may arrest the ship when it pulls into the U.S. And there are a lot of other places that you could arrest the ship to, as a matter of fact. Canada, Panama, different sorts of places like that. But what has gone on here is that Judge Wilson and... Isn't that what TENTA was about? Yes. I mean, TENTA was, everything happened abroad except there was a U.S. party. Yes. And we held that the lien applied, right? Yes. And it was in, where was it, Italy, I think. And the Exxon case... Someplace not in the U.S. Not in the U.S. Someplace not in the U.S. And so the, presumably, the supplier could have done what they wanted to do in Italy under Italian law. The ship was there. Saudi Arabia, same with the Exxon, could have done what it did there, but they waited until the ship pulled into the U.S. and arrested it here. And so whether you go through Malaysian law or U.S. law, and let's go into Malaysian law here. There was nothing presented before the court, and Malaysian law is really interesting. It's actually very accessible. It's all in Lexis. And it was interesting to go through it. But so it's not a matter of finding the law of Malaysia. What we didn't find, what wasn't found, what Judge Wilson noticed wasn't found, was anything that prohibited the incorporation of U.S. law into this contract under Malaysian law. Now, how do we have a spot check to know that that's okay? And the contract you're referring to is the contract for the sale of the bunkers? Correct. Not the contract for the lease of the vessel? Yes, but there's my... I'm sorry. The charter.  No, we're not talking about the charter. We're talking about the sale of the bunkers. Yes, Your Honor. That set the United States law as the basis for the transaction. But when you do look at the charter party, the charter party incorporates English law. And you say, well, you know, don't Joseph's Law clauses have to have something to do with the parties? These parties have nothing to do with English law. There it is in the charter party. Well, that's what Malaysian law allows. That's what Judge Wilson read the case law to do. And that's what it does. As a matter of freedom of contract, if you apply Malaysian law, Malaysian law will allow the importation of United States law for the contract, which makes sense here because these ships are going all over the place. And when the ship pulls into Long Beach, Malaysian law will recognize the law of the forum to support that choice of United States law for the arrest. So we did exactly what the plaintiff did. So the consent to the contract is what creates the power, the authority for us to rule on the case. Is that right? It is the start. The consent to the contract is... But the consent, I mean, the odd thing about it is the consent is not by the vessel owner who's stuck with the bill, but this other guy who specifically is barred by contract from putting a lien on the vessel. And he consents and he says, well, I agree to US law, which does exactly what I have promised not to do. And the vessel owner doesn't even get to ask the question. That's exactly what United States law does. United States law allows charters to enter into bunker contracts. And the problem pre-1971 was that the charters, and they still are, full of no lien clauses. And so Congress said, no, we're going to put the burden on the ship owner who has the best chance of policing the way that its charters do their business to communicate no lien clauses, to make sure that any bunker suppliers or any suppliers are on notice that there can't be a lien of the charter. It's the ship owner's affirmative duty to do this. These are not unsophisticated people. How do they do it? They nail something to the side of the ship? That's one way to do it. That's one way to do it. You require your charter to... But how would they have figured that out when it wasn't like they were looking at the ship when they were signing the contract? Yes. The other way to do it is you require your charter to report to you the suppliers that it has and you communicate out to them. You send them no lien letters. You require the charter to put a stamp. Now, in this transaction, what could have happened? Ken Hung orders the bunkers. TransTech comes back and says, here's your deal. Ken Hung, when it ordered the bunkers, it could say, I want you to know that we're operating under a charter that with a no lien clause, you're not going to have any maritime lien against this ship. They didn't do it. That's what the owner could have required Ken Hung to do. And these people are not people who are unknown to each other. The record shows the close relationship between the principles of Ken Hung and the principles of the Malaysians in the ship-owning company. And so they all know who they are. And this is what goes on in maritime commerce. If credit is not supported by maritime liens, everything falls apart. Why is that? Because the ship has to earn the money necessary to pay the necessaries providers. If the necessaries providers had to demand money up front all the time, then maritime commerce would grind to a halt. What would be the contract? Let's say that the ship owner puts out an international bulletin to all suppliers. And these are known suppliers. You just told me there's kind of a known community. International bulletin. We do not do lien contracts, right? Yes. So then Ken Hung, in effect, signs up with these terms and conditions because it gets them. So then what do you have? Then you have the supplier on notice that the charter does not have authority to incur maritime liens against the ship, overcoming the presumption of U.S. law that it does. Happens all the time. And you'll see in the case law, there's fights over whether there was proper communication of this sort of thing. Let me ask a different question. So if the maritime lien that takes effect here under U.S. law, does it have any viability outside of a U.S. port? Yes. Some countries will recognize it. Some won't. Panama, Canada, France, some ports in India will recognize it. All the important places. They're fresh in my mind, yeah. But a U.S. court's only jurisdiction would be if the ship were in a U.S. port. Is that correct? Yes. There's no way a U.S. court can send a marshal out to, although they'd like to go to Tahiti, it's kind of, you know. The reason I'm asking, I mean it seems sort of stupid, I know, but it's different in that respect than a copyright claim because you are dealing with a physical, tangible, an in rem situation in which you are physically in the United States at the time of enforcement. Yes. For U.S. court's enforcement, it's in rem. The court's jurisdiction depends on the rest being before the court. Absolutely. Actually, I have about two and a half minutes left. I wanted to respond to Mr. Gorman if that's all right with the court. Sure. Why don't you save the rest for Obama? Thank you. Good morning. I'd like to start off by, before I make my presentation and direct rebuttal of some of the comments made by my colleague. First of all, in response to the contention that because the vessel sails to U.S. ports, that that somehow should be a sufficient connection, there's case law that's cited in our brief that says that's simply not a sufficient U.S. connection where all the other points of contact are foreign. The vessel did go to Mexico from Korea, Manzanillo. Yes, it did ultimately come into the United States, but it went to Mexico first. The Gulf trading case that was cited by counsel, that involved a U.S. supplier. And the whole key here is how we're going to look at this transaction. Is this really a freedom of contract case? This is Tento? No, Gulf trading. Gulf trading versus Tento. I'm sorry. That's a Ninth Circuit case. Yes, Ninth Circuit, and I have it right here. And I read it just before I came up. And there was a U.S. supplier with substantial U.S. connection. And under the 1971 amendments, that's who we were protecting. Congress said, we're sick and tired of U.S. suppliers getting not paid, not being paid, when they're the ones that are subject to the no lien provisions. I don't remember seeing Congress saying that. Where did they say that? Say again? Where did Congress say that? When they passed... We're tired. You just said Congress said we're tired of... It's in the legislative history that the amendment was passed to protect U.S. suppliers. The 1971 amendment. Pardon me? It was just U.S. suppliers? U.S. suppliers. That's right. For the presumption of authority. Because Congress changed the law to presume authority where there... And the presumption of authority from the vessel owner was for the protection of U.S. suppliers. That's clearly in the legislative history. The Queen of Le Mans involved P&I insurance premiums. And again, look at the impact that the Queen of Le Mans case had in the United States. And that's why we have the extraterritorial application. Because of a matter of respect for the international law and the maritime laws of other countries, we look at what? Are U.S. citizens affected? Is there an impact in the United States? And it was a question... And all these cases involve the impact within the United States on a U.S. supplier or some situation such as a casualty that has impact in the United States. And that's the rationale for why the lien statute should not be applied extraterritorially. You started talking about the Queen of Le Mans case. Sir? You started talking about the Queen of Le Mans case. But I didn't understand your point. You said what impact it had. Queen of Le Mans is pretty clear. Parties agree to it. That's good enough. The contract provides for U.S. law as applicable law. Freedom of contract. That's fine. What's wrong with that decision? And what impact did it have that you're talking about? The Queen of Le Mans, the fact that the premiums involved, if the vessel didn't have P&I insurance and the vessel suffered a casualty within the United States, there would be an impact in the United States. That's not what they said. Is that a rationale they used? That's the right... I have it right here. Yes, I know. The court said that... Tell me where. As I recall, the Queen of Le Mans... I don't have the case right here, no. The court said that... that two parties agreed that the existence of a lien... the existence of a lien would be determined by the law of the jurisdiction where the vessel was located at the time the court... at the time the P&I club sought to enforce its claim. That, I submit, is different than here. I submit that... It looks to us, it says, look, the parties agree, that's good enough for us. If it's in the contract, that's good enough for us. Here it's in the contract. Do you dispute that? Do you dispute it's in the contract? The U.S. Choice of Law Clause? I think that the U.S. Choice of Law Clause shouldn't be respected here for the simple reason that... for 14 reasons, in fact, that it abrogates statutory rights under the law of every country that would otherwise touch the transaction. And it gives... What does that mean? What it means is this. The court has already determined that Malaysian law applies. Malaysian law gives a statutory lien, not a maritime lien. Korea gives a statutory lien. Singapore gives a statutory lien. 90% of the maritime jurisdictions in the world... But if Malaysian law were to say, yeah, we have a statutory lien, but if parties have a contract, they can agree to waive the lien, or they can agree to the law of Ulan Bator, why wouldn't you give effect to what Malaysia does in terms of choice of law? Because two parties can agree. What we're talking about here is affecting third parties. We're talking about abrogating the statutory rights of third parties. Not only are we talking about the rights of the vessel owner here, but we're also talking about the rights of the vessel's other creditors. And we're giving them a favorite position. You talk about statutory rights. What are these statutory rights? The statutory rights, under the law of Malaysia, a supplier gets a statutory lien. And he does not get a maritime lien. He gets a statutory lien. How does this undermine the statutory lien on Malaysia? He still gets a statutory lien. You also get a maritime lien under U.S. law. How does that abrogate, does it somehow nullify the statutory lien on the Malaysian law? Yes, it does. If this ship had sailed into the harbor in, what, Malaga or Kuala Lumpur or someplace in Malaysia, they would have a statutory lien. This wouldn't undermine the statutory lien at all, would it? Well, the lien arises by operation of law, does it not? And it arises at the time and place where the bunkers are furnished. And they were furnished in Korea. And the statutory lien says that you have a right to arrest the vessel to enforce the statutory lien so long as the contracting party, i.e. the charterer, still has an interest in the vessel. That's not the case here. So by granting, by enforcing a U.S. choice of law clause in this agreement, you've then abrogated the statutory lien that the laws of 90% of the maritime nations give. But that's because they agreed to it. That's because the charterer and the supplier agreed to it. Assuming they did, and it's my position that they didn't. But that's a different situation. Right. For discussion purposes, you're assuming that they did. And the question really arises as to whether or not there is a reasonable expectation for third parties to expect that under the circumstances of this case that U.S. law would apply. Don't forget, we're not talking about just a U.S. choice of law clause here. We're talking about deemed provisions. The contract will be deemed to be consummated when we grant the credit. The contract, the bunkers will be deemed to be supplied in the United States. The supplier is deeming himself all over the place to create a fictional U.S. connection. And I submit that where there's fictional contractual provisions that purport to bind third parties, there needs to be a substantial U.S. connection, there needs to be a U.S. impact, and there should be a reasonable expectation that these third parties should be bound by a choice of law that has no connection otherwise to the transaction. What is your best authority for the notion that if you have a third party impacted by a contract, that for purposes of the choice of law analysis, they basically have bidding rights? They have what? In effect, bidding rights. That's what you're sort of saying here. Look, they ought to be able to come in and say this is unreasonable vis-a-vis my situation and my ship. What is the best? The best case would be the reasoning supplied by Judge Gauthier in the Canadian case. Who, by the way, before she was appointed, was head of the Canadian Maritime Law Association. As well as the MV Tequila, which also holds that, and there's several district court cases which also hold that. That there's no U.S. maritime lien necessary supplied in a foreign port by a foreign supplier. But we don't. Do we really have a is there any circuit case that alludes to this other than the not that I'm aware of, no. In any event, going on if we talk about the Malaysia choice of law I believe that there's a misstatement about what Malaysia law does. I think Malaysia law, and the only evidence on Malaysia law, what it would do here is that Malaysia law holds that the Lex Causi and the Lex Fori both have to recognize the lien before a maritime lien can be enforced. You don't get either or. And I think that the use of the word also and it's cited in my brief where Malaysia would not recognize a maritime lien unless the Lex Fori also recognizes a maritime lien I don't think we can ignore the use of the word also. The charters, Ken also said the charters are full of no lien clauses. Of course they are. Because 90% of the maritime nations of the world say that this is a scheme upon which you do business. Only the United States which favors US suppliers grants the presumption of authority. And I submit that where there's contractual fictions and what I call these deemed provisions that there has to be something more France also accepts that, right? Say again, please? France also does. France accepts a maritime lien in certain circumstances but not to the same extent. That gets us all the way to Tahiti, doesn't it? Say again, please? That gets us all the way to Tahiti, doesn't it? That gets us to Tahiti. That does indeed. I mean, it's not just France proper France has possessions all over the Pacific Caribbean, doesn't it? Yes, it does. It's not a trivial minority. I'm not suggesting that it is. What I'm suggesting is that why should the US lien statute presumptively apply to a foreign transaction? There seems to be no legislative history saying so. It's really a pretty clear-cut question on this one point. And the question is does the fact that parties agree to US law, should that be determinative as to whether or not you adopt a US lien law? And you can go one way or the other. Queen of Flaman goes one way and the MV Tequila label line goes the other way. The do a balancing analysis on the Lawritson and the Fifth Circuit in Queen of Flaman says freedom of contract parties are sophisticated they all know what they're doing. If they say that's they adopt US law, there's no reason to dispute that. And the Ninth Circuit There's a lot to be said for both positions. If you analyze this as a question of freedom of contract and buying non-parties to that  that's certainly one way to look at it, isn't it? It's not that big a deal because these are not total strangers. They all know so long as the rules are established it doesn't really matter in a sense what the rules are because if your client is aware that in fact your charters can buy bunkers and bind themselves to US law then what they'll have to do is be more vigilant about sending out notices that says our charters do not have that authority. You can't fault your clients for having been terribly vigilant about making this known to people who sell supplies to your charters, right? Your client could have done a better job of letting parties know. But the only thing that really matters is to have the rules clearly established. Once the rules are clearly established your client is a big guy same is true of the people on the other side everybody knows what the rules are you can adjust accordingly. Well I think that's not the correct way to look at it because there ought to be some reasonable expectation on the part of the owner and third party creditors that that body of law would apply and in the circumstances of this transaction if we say this it is. If we say that's expectation then it becomes reasonable expectation. And then from now on in people will realize gee if you are in that situation and your ship winds up sailing into US waters particularly US waters of the 9th circuit you're going to get stuck. So you better make darn sure that people are aware that your charters don't have the authority to consent to liens. It doesn't strike me as that big a deal one way or the other. I mean not for the purpose of this transaction but in terms of future conduct owning is a rule, right? What we need is a clear rule and a clear rationale and I submit that How about this for a clear rationale if you put it in the contract then we will apply to the United States your client will know what the rule is and then I would guess they would then send out emails and telegrams and whatever they send out saying as to any of our ships don't count on this because none of our charters have authority to bind these liens and you would do this every month or two and you would buy ads in the London newspapers those papers that have ship notices and all those things it's not that big a deal Then you put the rabbit back in the hat as to how the vessel owner or the creditors are going to satisfy these deemed provisions with regard to actual notice The question has to get a different way Judge Kaczynski posits one way it might be certain but what is the rule that you would ask us to adopt? I would ask you to adopt the rule that where there's no connection between the actual facts and the transaction and you're going to bind third parties that there be a in order to apply the lien act extra-territorially there be a substantial connection between the transaction and the United States So apply that to the TENTO case MV TENTO Yes And GULF GULF was a US supplier But that's all There's nothing about the transaction that had any contact with the United States It had to be the identity of one of the parties That's with due respect sir the bunkers were ordered through a New York broker in GULF The transaction had a US locus because the bunkers were ordered in New York and the Panama Canal the Panama Canal funds they were supplied in Italy but they were paid for by the Gulf Oil in the United States Gulf Oil was the one who suffered the loss Gulf Oil was the one that that was held to have the right to enforce There was a US impact on the transaction and that's the rule that I'm asking you to recognize which continues the line of TENTO Let me change the fact of TENTO just a little bit Let's say that in fact this was brokered through New York but none of the parties were American but they used a it was brokered through a New York jobber My response is that if it's not a US supplier then the reach of the lien shouldn't extend So where's your clarity of transaction then? Now I would say well, but there was a contract and then you'd be back here arguing well, you used a US jobber you used a contract that was brokered through New York that's enough of a contract Is it much clearer to say look, if it's in the contract US law applies very clear, black and white it's on the contract, it applies No, I'm saying that if there's If there's If there's a US supplier and there's a US impact that's the rule that needs to be recognized because that's the rule that's been recognized in the cases What if you have a foreign corporation supplying to a foreign ship but in a US port There's a US but the impact isn't there I don't know Yes there is Because the impact within the territorial jurisdiction is clear and why shouldn't the US law apply? It should All the US does under this version of the hypothetical is all you've got is people that are pumping oil It's not oil that belongs to the United States or anybody in the United States They just happen to be the place where the thing is delivered So the people actually pumping the oil are Americans but nobody else is The oil is owned by a foreign party The ship is a foreign party The charter is a foreign party The job is a foreign party It just so happens that the ship needs oil in the United States so they have it delivered there That's a hypothetical that has absolutely no realistic chance of ever becoming a reality because there's no foreign oil suppliers within the United States that would be supplying bunkers to a ship within the US You're talking about a situation where The problem I have is it keeps saying it's US suppliers but it's not written that way and the statute isn't ambiguous so I appreciate the legislative history and I read the portions that you quoted which are somewhat persuasive but then I'm not sure where you're supposed to even go there in terms of looking at the statute and looking at a contract What even gets us to the legislative history? What gets us to the legislative history I submit is because you're affecting the rights of third parties who aren't parties to this agreement in derogation of the laws of other countries that would otherwise apply and that leads me right into the issue as to whether or not the US choice of law and the other provisions were ever validly incorporated into the bunker confirmation and I submit that and it's argued in my brief that they were not and where the and I think the lower court ignored a Singapore case right on point we're talking about these unusual provisions and they're unusual in this sense it's if you look at the bunkers the bunker transaction as it existed bunkers supplied by a Singapore supplier to a Malaysian vessel in Korea you're altering by contract that scheme under those facts there's no reasonable expectation that US law would apply or that the transaction would be governed by any other law other than the Malaysia, Singapore or Korea now if you're going to change that scheme by contract and if you're going to affect third parties including vessel owners then I submit that that change ought to be clear explicit and fairly and reasonably brought to the attention of the other contracting party and the cases that are cited in the brief hold that they are not thank you we have about two and a half minutes two minutes and forty seven seconds for rebuttal let me just ask we would be at odds with the 11th circuit if we were to adopt your position wouldn't we? no, if you look at Queen of Le Mans 2002 they said nothing about this Trinidad case think of the appellate panel in 2002 looking back at Trinidad you've got a foreign supplier maybe they didn't we don't know well it's their court and it's the only thing before that that's the great thing about maritime law you don't have a whole lot of cases so there's Queen of Le Mans or Trinidad that's the bad thing about maritime law depends on how you look at it but here's Trinidad and it says okay here's a foreign supplier lots of that insurance was supplied outside the U.S. says nothing about the U.S. interest by the way and whether there's insurance and the panel's sitting here and saying good grief there's nothing that supports this so there's Queen of Le Mans and they don't mention Trinidad there's no discussion of Trinidad in any of these cases an interesting thing about the Nolene notices your honor that you mentioned is that this was a time charter the owners people were the people on the boat they were the people getting the confirmations they were the people knowing who the suppliers were getting it there was absolutely great information going back to the owners from their own people on the boat because it's a time charter about who the suppliers were they're in a great position to communicate Nolene clauses it's in their charter why didn't they do that because everything would have come to a grinding halt nobody would have sold bunkers to this ship we talked about the artifice of law applying in its contract binding third parties let's take a look at the charter English law they say as a matter of English law in this charter there's no liens well what's good for the good for the owner is good for the supplier but the way when you apply United States law here which is what the parties chose the outcome is that it's now up to the owner whose people are on the boat to communicate this problem the as far as making it explicit Judge Wilson dealt with that very well he looked at this the closest analogy which was arbitration clauses he says no even if this were a arbitration clause question which it isn't the arbitration clause would come in but as far as choice of law this is international transaction this is what people expect to see in a contract in international clause and by the way this is not a new issue what do bunker suppliers want they want liens they want to apply United States law Malaysia has no problem with the court doing that here what the owner side is asking this court to do is to say well we're going to second guess Malaysia law here we're going to impose our American sensibilities supposedly about extraterritoriality which doesn't apply here on what Malaysian courts would say as far as Malaysian courts say the Lex Causi the provision under an agreed choice of law clause United States matching the Lex Fori Long Beach where the ship pulled in perfectly okay to arrest interesting thing about this ship it never went to Malaysia it never came to Malaysia we're not talking about the ship pulling into Kuala Lumpur getting a supply here and having Malaysia law apply we're talking about a ship going all over the place never coming anywhere close to Malaysia and coming into the port of Long Beach just like the Tenerife I have one other question and that is parties can contract to almost anything and they contract to all kinds of governing law in international contracts so the fact that they contracted to US law simply means that the laws of the United States apply but if a lien cannot arise on a wholly foreign transaction a parties contract couldn't override that principle could it? If a lien can arise on a wholly foreign transaction but I will be taking an airplane home I mean I won't be flying by myself the way the law is and looking back into the history of maritime lien law that we sat on in our brief these hoary dusty Supreme Court cases talk about that's the way maritime lien law works there's a foreign supplier ordered by a person with authority they show up in the US you arrest them it happened all the time into the 19th century into the 20th century the 1971 amendments didn't change that a bit except the duty of inquiry about no lien clauses and in the tento setting out the legislative history the court said put it on the supplier after all they know that maritime liens are going to be a problem it's in their charter they say you can't incur these what's the remedy for the ship owner? you've got a breach of charter party just like they didn't pay rent they incurred a lien go get them who bears the burden? not the supplier as far as congress is supposed to say and you've got your own people on the ship who can bear the burden? our people aren't on that ship we're not looking at communicating back to the owner these sorts of things so you're basically saying that in an effort to protect US suppliers they collaterally benefit others as well in the amendments yes by choice of law freedom of contract they've done that they've done that law magnet yes essentially so it becomes a beacon people put it in there and then they hope that these ships are pulled into US ports or a port of one of these places that recognizes the lien so if they pull in Tahiti for example Tahiti would apply US law France recognizes the lien Canada this Kurgan Holdings case is straight opposite it's a little bit of business for our maritime lawyers it is an interesting business that's for sure it depends on this credit you don't think you guys want to just settle this case do you? it's not that much money a couple hundred thousand dollars peanuts did you go through the mediation program? yes we did the issue is significant to both sides the I think you're not in it for the money huh? we the issue is significant yes the money your honor the money is significant the issue of international commerce and for bunker suppliers is significant if you lost where would that leave you? if you significantly lost this case and you had an opinion that basically so taking the other side well we can hope that this would be the first maritime lien case since Gulf Oil to go up to the Supreme Court if you weren't successful in being one of the 70 cases to go to the US Supreme Court next year where would that leave you as a matter of commercial certainty that would leave us with a big problem because what would happen is every time one of these cases came up to this court and thank goodness for Judge Wilson because he did a magnificent job on this case I wish that we had why are you appealing? because he just needed as I read the opinion it was like that runner that gets to mile twenty five and a half of the marathon and he said I just yes Charlie Horse and so what we'd like to do is help him get across that goal line or that finish line just like lots of other courts would do and were probably as fatigued as Judge Wilson they tripped over this Trinidad case and it gets repeated and repeated and repeated and it really is a virus in maritime law a small virus but it causes problems and if there's not this kind of certainty parties being able to choose law every time there's a ship arrest that involves a foreign provision we're going to have to run through these Lauritzen factors and not every place like Malaysia has Lexis we might come up against the law of Taiwan or something like that there has to be certainty in international transactions the presence of the other side proposition would give you look if you have no U.S. connection you can't hang your hat on U.S. law that's pretty simple isn't it your honor first off it's not like there was no U.S. connection here in our brief we've cited the U.S. connections but in maritime commerce again coming back to this your own charter party has English law no English connection in it it is common to have choice of law clauses like this in maritime agreements so what are they griping about here's U.S. law it's going to be the one that bunker suppliers will choose it's what you look for in the bunker confirmation it says there's a maritime lien when we give you our stuff what are you going to do just overlook that let it go well if everything works fine your charterer gets credit they pay the supplies out of the money they earn from the voyage and you're just fine you get your charter hire paid everybody's happy but when it breaks down like this when the charterer goes out of business then the question is who is in the best position to bear the loss if the owner has decided that they're going to benefit from the credit that the charterer gets then they've got to take the downside to that that's what was happening here so they should expect these sort of clauses to show up and the charterer does tell you that they do expect that thank you case is argued we are adjourned
judges: Kozinski, Tashima, McKeown